1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            sbogdanovich@bursor.com
            idiaz@bursor.com

2

3

4

5

6

7

*Attorneys For Plaintiff*

8

9

10

11

12          **UNITED STATES DISTRICT COURT**

13          **NORTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| CHRISTINE GARCIA, individually and on behalf of all other persons similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **<u>JURY TRIAL DEMANDED</u>** |
| ALO, LLC, | |
| Defendant. | |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Christine Garcia ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant, Alo, LLC ("Defendant" "Alo"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Alo for breaching its customers' trust and allowing companies scattered around Silicon Valley to invade its customers' privacy through two of its websites, alomoves.com and aloyoga.com (collectively the "Websites"). In particular, Alo helped Meta Platforms, Inc. ("Meta"), Google LLC ("Google"), Microsoft Corporation ("Microsoft"), Snap, Inc. ("Snap"), and Heap Analytics ("Heap"), (collectively the "Third Parties"), collect and intercept customers' communications with Alo as consumers either searched for products on aloyoga.com by typing search terms into the search bar on the website, or answered questions to the onboarding survey on alomoves.com.

2.      Alo's business focuses on fitness, wellness, mindfulness, and of course, yoga. Through its alomoves.com website, Alo offers a subscription to fitness, yoga, and wellness courses for a monthly fee.[1] Alo's aloyoga.com website focuses on selling workout equipment, yoga clothing, workout clothing, intimate clothing, and wellness products such as supplements.[2]

3.      Consumers use Defendant's Websites in hopes of improving their mind and body. What consumers don't know is that their personal improvement journey is not so personal. Instead, Defendant has allowed the Third Parties to contemporaneously capture the electronic communications consumers direct towards Defendant through its Websites. And all of this is done to help Defendant with its own "personal improvement" such as to assist its marketing, advertising, and data analytics efforts.

---

[1] ALO MOVES, https://www.alomoves.com.

[2] ALO, https://www.aloyoga.com.

4.      The nature of the Third Parties' licensing agreements with Defendant are such that Defendant "aids, agrees with, employs, or conspires" to permit the Third Parties to read, attempt to read, to learn, and/or to use the confidential communications of Website visitors without prior consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a) and 632.

5.      Plaintiff brings this action on behalf of all California residents who conducted searches for products on aloyoga.com or answered Defendant's onboarding survey on alomoves.com while in California, and whose electronic communications were intercepted or recorded by Meta, Google, Microsoft, Snap, and Heap.  Defendant has enabled these Third Parties to intercept visitors' communications by employing these Third Parties' services to track users across the Website (collectively the "Tracking Tools").

## THE PARTIES

### I.     PLAINTIFF

6.      Plaintiff Christine Garcia is an adult citizen of the state of California and resides in Concord, California.

7.      Plaintiff Garcia created a Facebook account around 2008.  In March 2024, Plaintiff Garcia visited Defendant's alomoves.com website to register for a subscription to Defendant's online workout classes.  During the sign-up process, Plaintiff Garcia answered Defendant's onboarding survey questions.  Plaintiff Garcia's answers to the survey questions were communications intercepted in transit by Heap—as enabled by Defendant.  Neither Defendant nor Heap procured Plaintiff Garcia's prior consent to this interception.  Plaintiff Garcia did not discover and could not have discovered this violation until approximately March 2024 upon her retention of counsel.

### II.    DEFENDANT

8.      Defendant Alo, LLC. ("Alo") is a California limited liability company with its principal place of business in Beverly Hills, California.

**JURISDICTION AND VENUE**

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

10.    The Court has general personal jurisdiction over Defendant because Defendant is a California limited liability company and has its principal place of business in California, meaning it is at home in the State of California.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

**FACTUAL ALLEGATIONS**

I.    **OVERVIEW OF THE THIRD PARTIES' TRACKING TOOLS**

12.    Defendant enables Meta, Google, Microsoft, Snap, and Heap to intercept Plaintiff's and Class Members' communications by employing the Third Parties' Tracking Tools on its Websites in the manner described throughout this Complaint.

A.    **The Meta Pixel**

13.    Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and must share "the name they go by in everyday life."[4]  To that end, when creating an account, users must provide their first and last name along with their birthday and gender.[5]

_____

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, Wall. St. J. (Oct. 21, 2021).

[4] META, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[5] META, SIGN UP, https://www.facebook.com/

14.     Meta owns facebook.com and generates revenue by selling advertising space on that website, and other applications it owns, like Instagram.[6]  In 2021, Facebook generated $117 billion in revenue.[7]  Roughly 97% of that came from selling advertising space.[8]

15.     Meta sells advertising space by highlighting its ability to target users.[9]  Meta can target users so effectively because it surveils user activity both on and off its site.[10]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[11]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[12]

16.     Advertisers can also build "Custom Audiences."[13]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[14]  With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike

---

[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[7] META, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[8] *Id.*

[9] META, WHY ADVERTISE ON FACEBOOK INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[10] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[11] META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

[12] META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[13] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[14] *Supra* note 12.

Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[15]

17.    Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[16]

18.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[17]

19.    Put succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

20.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata.[18] However, Meta's Business Tools can also track other events.  Meta offers a menu of "standard

---

[15] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[16] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; META, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[17] META, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[18] See META, META PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also META, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

---

events" from which advertisers can choose, including what content a visitor views or purchases.[19] Advertisers can even create their own tracking parameters by building a "custom event."[20]

21.     One such Business Tool is the Meta Tracking Pixel.  Meta offers this piece of code to advertisers, like Defendant, to integrate into their website.  As the name implies, the Meta Tracking Pixel "tracks the people and type of actions they take."[21]  When a user accesses a website hosting the Meta Tracking Pixel, Meta's software surreptitiously directs the user's browser to simultaneously send a separate message to Meta's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data the Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and a website: the website's own code, and Meta's embedded code.

22.     An example illustrates the point.  Take an individual who navigates to aloyoga.com and enters search terms into the Website's search bar.  Once the individual enters in the search terms, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Defendant utilizes the Meta Tracking Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser or mobile phone, without alerting the individual that this is happening.  Meta causes the browser to secretly and simultaneously duplicate the communication with Defendant, transmitting it to Meta's servers alongside additional information that transcribes the communication's content and the individual's identity.  This entire process occurs within milliseconds.

23.     In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to Meta at the same time as they are being sent to Defendant.  Thus, Meta's interception of these communications

---

[19] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[20] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[21] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

occurs "in transit."  *See*, *e.g.*, *In re Facebook Internet Tracking Litigation.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device.  Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *15-16 (N.D. Cal. Nov. 8, 2023) (finding in-transit interception was alleged based on a similar process to the one alleged herein).

24.    After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.  In order to engage in the above-described processing, analysis and assimilation, on information and belief, Meta has to view the information being processed, analyzed and assimilated.  As such, upon information and belief, Meta regularly viewed and used Plaintiff and Class Members' communications that it intercepted via the Meta Pixel.

25.    Meta's other Business Tools function the same.  For mobile applications, advertisers can utilize the Meta SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[22]

26.    Advertisers can also utilize the "Conversions API."  The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[23]  More technically, the Conversions API is Meta code that advertisers can implement server-side.[24]

[22] META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[23] META, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api. This refers to device specific privacy controls.

[24] *Id.*

27.     Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Meta's Conversion API endpoint."[25]

28.     When the Conversions API collects "[s]erver events," those data points are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[26]  As with the Meta Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.[27]  Meta "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices."[28]

29.     Meta confirms, in its "Meta Business Tools Terms,"[29] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant.  For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."[30]  In other words, Meta can use the wiretapped information for its own "research and development," and to "protect" its own products and services.[31]

30.     Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products"[32]

---

[25] *Id.*

[26] *Id.*

[27] META, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one.  If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

[28] *Id.*

[29] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[30] *Id.*

[31] *Id.*

[32] *Id.*

31.     Further, Meta can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[33]

32.     Finally, Meta can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[34]

33.     Thus, Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to its customers, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

**B.     Google Analytics**

34.     Google offers a range of advertising software, one of which is called Google Analytics.

35.     "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[35]  This is made possible by the Google Analytics Pixel, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[36]

36.     Google advertises this service can "[m]onitor activity on your site as it happens."[37]

---

[33] *Id.*

[34] *Id.*

[35] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447?hl =en&ref_topic=14089939&sjid=2827624563183915220-NC.

[36] *Id.*

[37] GOOGLE, THE FINER POINTS, https://marketingplatform.google.com/about/analytics/features/.

37.    Google's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Google Analytics Pixel.

38.    Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered into websites via website features like search bars.

39.    That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant).  Upon information and belief, in order to analyze the intercepted communications, Google views the intercepted communications.  As such, on information and belief, Google viewed Plaintiff and Class Members' communications with Defendant in order to provide advertising services to Defendant.

40.    Once Google intercepts website communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[38]

41.    Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

42.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market its advertising capabilities to future clients.

43.    In sum, Google has the capability to use the communications it intercepts for own purposes other than simply providing a recording to its customers, including but not limited to (i) improving its own products and services; (ii) developing new Google for Business and Google

---

[38] GOOGLE, GOOGLE PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

Analytics products and services; and (iii) analyzing website visitors' communications to assist with

and data analytics and targeted advertising.

**C.      Microsoft Advertising**

44.      Microsoft offers a range of advertising services.  One of these services is called

"Conversion Tracking."[39]  Microsoft states that Conversion Tracking allows Microsoft's "platform

[] match [its customers] to searchers across [Microsoft's] network who are more relevant to [its

customers'] business."[40]  In order for Conversion Tracking to take places, Microsoft requires that

its customers set up a "Universal Event Tracking (UET) Tag" on their websites.[41]  To do this,

Microsoft's customers must "add the UET tag tracking code directly into [their] website[s'] code

using JavaScript."[42]

45.      Microsoft describes the UET as a "powerful tool that records what customers do on

your website" and describes that "[b]y creating one UET tag and placing it across your website,

Microsoft Advertising will collect data that allows you to track conversion goals and target

audiences with remarketing lists."[43]  Specifically, a UET tag will allow a business to track things

like "the quantity of people that visited a specific page or section" on its website and to create

custom events to track.[44]

---

[39] MICROSOFT ADVERTISING, CONVERSION TRACKING, https://about.ads.microsoft.com/en-us/solutions/tools/conversion-tracking.

[40] *Id.*

[41] *Id.*

[42] MICROSOFT ADVERTISING, HOW DO I ADD A TAG TO MY WEBSITE?, https://help.ads.microsoft.com/#apex/ads/en/56688/-1

[43] MICROSOFT ADVERTISING, UNIVERSAL EVENT TRACKING, https://about.ads.microsoft.com/en-us/solutions/tools/universal-event-tracking#:~:text=Universal%20Event%20Tracking%20(UET)%20is,target%20audiences%20with%20remarketing%20lists.

[44] *Id.*

46.    The UET tag uses a number of cookies.[45]  One of these cookies is the MUID cookie.[46]  The MUID cookie is "[u]sed by Microsoft as a unique identifier" and the purpose is to "synchronize the ID across many different Microsoft domains to enable user tracking."[47]

47.    Microsoft's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the UET tag.

48.    Thus, through websites that employ Microsoft's Conversion Tracking services, Microsoft directly receives the electronic communications of website visitors entered into websites via website features like search bars.

49.    That information is then analyzed by Microsoft before being provided to any entity that was a party to the conversation (like Defendant).  Upon information and belief, in order to analyze the intercepted communications, Microsoft views the intercepted communications.  As such, on information and belief, Microsoft viewed Plaintiff and Class Members' communications with Defendant in order to provide advertising services to Defendant.

50.    Once Microsoft intercepts website communications, it has the capability to use such information for its own purposes, including but not limited to "[p]rovide our products, which includes updating, securing, and troubleshooting, as well as providing support," to "[i]mprove and develop [its] products," to "operate [its] business, which includes analyzing [its] performance, meeting [its] legal obligations, developing [its] workforce, and doing research."[48]

51.    Microsoft's range of software services is based on Microsoft's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

---

[45] MICROSOFT ADVERTISING, FAQ: UNIVERSAL EVENT TRACKING, https://help.ads.microsoft.com/#apex/ads/en/53056/2-500.

[46] Id.

[47] STACKABLE, COOKIE POLICY, https://wpstackable.com/cookie-policy/.

[48] MICROSOFT, MICROSOFT PRIVACY STATEMENT, https://privacy.microsoft.com/en-us/privacystatement.

52.    Information from websites, like Defendant's Website, is central to Microsoft's ability to successfully market its advertising capabilities to future clients.

**D.    Snap Pixel**

53.    Snap owns the popular messaging and social networking app called Snapchat.  Snap also provides services to businesses, such as advertising services.[49]  Specifically, Snap advertising is suitable for businesses wanting to target their advertising towards "Gen Z and Millennials."[50]

54.    Among Snap's advertising tools, Snap offers the Snap Pixel.[51]  The Snap Pixel "is a piece of JavaScript code" that is installed on businesses' websites.[52]  The Snap Pixel is used to track and collect consumers' actions on a business's website "such as page views, add-to-cart actions, purchases, and sign-ups."[53]  The data collected via the Snap Pixel is then used to "allow businesses to connect with Snapchatters based on their online and real world interests and behaviors"[54] through creating "Custom Audiences to reach people who've already engaged with [the] business" or creating "Lookalike Audiences to reach people who are similar to [businesses'] current customers.[55]  Businesses using Snap's advertising tools can even "[r]each Snapchatters based on their past buying patterns or viewing behaviors" by tapping into Snap's "expansive data marketplace" with "third-party custom audiences."[56]

55.    When the Snap Pixel is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the Snap Pixel involves Snap, a separate and distinct third-party entity from the parties in the conversation, using the Snap Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a

---

[49] SNAP, https://forbusiness.snapchat.com/.

[50] *Id.*

[51] SNAP, https://forbusiness.snapchat.com/advertising/snap-pixel#about.

[52] *Id.*

[53] *Id.*

[54]  SNAP,  https://forbusiness.snapchat.com/blog/snapchat-ads-targeting-options-reach-your-target-audience-on-snapchat.

[55] *Supra* note 60.

[56] *Supra* note 63.

party.  This is so because Snap itself collects the content of any conversation.  That information is then analyzed by Snap before being provided to any entity that was a party to the conversation (like Defendant).

56.    Upon information and belief, in order to analyze the intercepted communications, Snap views the intercepted communications.  As such, on information and belief, Snap viewed Plaintiff and Class Members' communications with Defendant in order to provide advertising services to Defendant.

57.    Once Snap intercepts the Website communications, it has the capability to use such information for its own purposes.  For example, Snap "and its affiliates" can utilize Conversion Data—data gathered via the Snap Pixel related to actions consumers take on businesses' websites used to generate Custom audiences—to "improve and supplement [its advertising] Services (including to optimize Snap's targeting and ad effectiveness),"[57] and to "develop and improve the algorithms and machine learning models (an expression of an algorithm that combs through significant amounts of data to find patterns or make predictions) that make [Snap's] features and Services work."[58]

58.    Snap's range of software as a service "SaaS" services is based on Snap's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

59.    Information from websites, like Defendant's Website, is central to Snap's ability to successfully market its advertising capabilities to future clients.

E.    **Heap Analytics**

60.    Heap provides a service called Autocapture for its clients to track consumers' activities on their websites.  Heap describes Autocapture as a tool that allows Heap to collect "all

---

[57] SNAP, SNAP CONVERSION TERMS, https://snap.com/en-US/terms/snap-conversion.

[58] SNAP, PRIVACY POLICY, https://values.snap.com/privacy/privacy-policy.

the data on your customers—automatically. What they click. Where they go. What they do, even when you're not looking."[59]

61.    Heap advertises that its Autocapture software is different from other companies' tracking tools because other tools rely on manually setting up tracking code to capture users' interactions with specific buttons/aspects of a website.[60] . Instead, Autocapture collects everything that occurs on the website automatically.[61]

62.    Once Heap tracks and collects all the activities that consumers take on a website, Heap analyses and interprets that data to identify user behavior patterns.[62] Heap also provides what it calls Behavioral Segmentation which is "a type of analysis that sorts users according to their behavior in an app or website and looks for patterns among different groups."[63] Behavioral Segmentation allows Heap's clients to "target better customers and prioritize maximizing the behaviors and metrics [that they are] trying to produce."[64]

63.    Upon information and belief, in order to analyze the intercepted communications, Heap views the intercepted communications. As such, on information and belief, Heap viewed Plaintiff and Class Members' communications with Defendant in order to provide advertising services to Defendant.

64.    As such, besides collecting all consumer activity on a website, Heap's services also involve analyzing that collected data to provide clients with informative analytics. Heap also admits it " 'sold' or 'shared' [Californian visitors'] identifiers, demographic information, Internet or other electronic network activity information, approximate geolocation, and inferences drawn from the above… to or with entities who provide advertising, marketing, or audience measurement;

---

[59] HEAP, HOW HEAP WORKS, https://www.heap.io/why-heap/how-heap-works

[60] HEAP, Episode 1: Autocapture, https://www.heap.io/why-heap/how-heap-works.

[61] *Id.*

[62] HEAP, DOWN THE FUNNEL, https://www.heap.io/topics/how-to-evaluate-behavioral-analytics-software.

[63] HEAP, WHY YOU SHOULD START USING BEHAVIORAL SEGMENTATION, https://www.heap.io/topics/why-you-should-start-using-behavioral-segmentation.

[64] *Supra* note 60.

and social networks."[65] "The business or commercial purposes of 'selling' or 'sharing' personal information is to assist us with advertising, marketing, audience measurement, and other functionality on our digital properties."[66]

## II.    DEFENDANT USES THE THIRD PARTIES' TRACKERS TO INTERCEPT ITS WEBSITE USERS'S COMMUNICATIONS

### A.    Defendant Enables Meta, Through The Meta Pixel, To Intercept Users' Communications With Defendant.

65.    Defendant has integrated the Meta Pixel, into its Website, aloyoga.com.  By integrating the Pixel into its Website code, Defendant has enabled Meta to intercept Defendant's website users' communications with Defendant as users search for products on aloyoga.com without users' consent.

66.    Through the Meta Pixel, Defendant enables Meta to intercept users' communications with Defendant.  When a user conducts a search on Defendant's website, communicating with Defendant that they are interested in a particular product, because Defendant installed the Meta Pixel on its Website, the Meta Pixel generates two events—a Search event and a PageView event—that share metadata to Meta.  The metadata for these events includes the exact search terms users input in Defendant's Website's search bar.

67.    For example, when a user searches for "thongs" on aloyoga.com, the Meta Pixel generates a Search event that includes metadata that tells Meta the user searched for "thongs."  *See* Figures 1-2

---

[65] HEAP, CALIFORNIA PRIVACY NOTICE FOR CALIFORNIA RESIDENTS, https://www.heap.io/privacy#california-notice.
[66] *Id.*



**Figure 1**



**Figure 2**

68.     The Meta Pixel also generates a PageView event that similarly includes metadata that tells Meta the exact terms a user searched for.  For example, Figures 3-4 show the PageView event that shares metadata with Meta which includes a user's search for "thongs."



**Figure 3**



**Figure 4**

69.    When a consumer decides to purchase an item, Meta knows this too.  For example, when a user adds an item to their cart, Meta generates an "AddToCart" event that sends metadata to Meta telling Meta the exact name of the product the user chose to add to their cart.  As seen in Figure 5, the Website user added a size small, black Airmesh Venus Thong to their cart and Meta obtained that information.



**Figure 5**

**B.    Defendant Enables Google, Through Google Analytics, To Intercept Users' Communications With Defendant.**

70.    Defendant has also integrated Google Analytics, into its Website aloyoga.com.  By integrating Google Analytics into its Website code, Defendant has enabled Google to intercept Defendant's Website users' communications with Defendant as users search for products on aloyoga.com without users' consent.

71.    Through Google Analytics, Defendant enables Google to intercept users' communications with Defendant.  When a user conducts a search on Defendant's website, communicating with Defendant that they are interested in a particular product, because Defendant

installed Google Analytics on its Website, Google Analytics collects the URL for the page on Defendant's Website that the user is on.  The URL includes the search terms the user typed into the search bar on Defendant's Website.

72.    For example, when a user searches for "thongs" on Alo's Website, Google Analytics intercepts this communication by collecting the URL of the web page which includes the exact search terms.  *See* Figures 6-7.



**Figure 6**

**Figure 7**

73.    Further, when a Website user decides to purchase an item, Google will know the name of the exact item.  For example, when a user adds an item to their cart, Google will receive the exact name of the product the user chose to add to their cart.  As seen in Figure 8, when a Website user adds the black, size small, Airmesh Venus Thong to their cart, Google obtains that information.



**Figure 8**

## C. Defendant Enables Microsoft, Through Microsoft's Conversion Tracking, To Intercept Users' Communications With Defendant.

74. Defendant has also integrated Microsoft's UET tag, into its Website aloyoga.com. By integrating the UET tag, into the Website's code, Defendant has enabled Microsoft to intercept Defendant's users' communications with Defendant as users search for products on aloyoga.com without users' consent.

75. Through Microsoft's Conversion Tracking via the UET tag, Defendant enables Microsoft to intercept users' communications with Defendant. When a user conducts a search on Defendant's website, communicating with Defendant that they are interested in a particular product, because Defendant installed the UET tag on its Website, Microsoft collects the URL for the page on Defendant's Website that the user is on. The URL includes the search terms the user typed into the search bar on Defendant's Website.

76.    For example, when a user searches for "thongs" on Alo's Website, Microsoft intercepts this communication by collecting the URL of the web page which includes the exact search terms.  *See* Figures 9-10.



**Figure 9**



**Figure 10**

77.    Further, when a Website user decides to purchase an item, Microsoft will know the name of the exact item.  For example, when a user adds an item to their cart, Microsoft will receive the exact name of the product the user chose to add to their cart. As seen in Figure 11, when a Website user adds the black, size small, Airmesh Venus Thong to their cart, Microsoft obtains that information.



**Figure 11**

**D.    Defendant Enables Snap Through the Snap Pixel To Intercept Users' Communications With Defendant.**

78.    Defendant has also integrated the Snap Pixel, into its Website, aloyoga.com.  By integrating the Snap Pixel into its Websites' code, Defendant has enabled Snap to intercept Defendant's Websites users' communications with Defendant as users search for products on aloyoga.com without users' consent.

79.    When a user conducts a search on aloyoga.com, communicating with Defendant that they are interested in a particular product, because Defendant installed the Snap Pixel on its Website, Snap collects the URL for the page on Defendant's Website that the user is on.  The URL includes the search terms the user typed into the search bar on Defendant's Website.

80.    For example, when a user searches for "thongs" on aloyoga.com, Snap intercepts this communication by collecting the URL of the web page which includes the exact search terms. *See* Figures 12-13.



**Figure 12**



tr.snapchat.com
GET
/p?pid=a7e37244-b416-41ff-9e75-5d6b9aed6624&ev=PAGE_VIEW&intg=gtm&u_em=&pids=a7e37244-b416-
41ff-9e75-5d6b9aed6624&u_c1=6230ed01-8440-4e21-89c2-dd9c169b7afa&u_sclid=981ab9ec-1dca-4d84-b59d-
4465d4546ef2&u_scsid=dd56cd45-afb2-4173-a03a-
944abda0836a&bt=1d53c387&d_a=x86&d_bvs=%5B%7B%22brand%22%3A%22Chromium%22%2C%22version
%22%3A%22124.0.6367.63%22%7D%2C%7B%22brand%22%3A%22Google%20Chrome%22%2C%22version%22
%3A%22124.0.6367.63%22%7D%2C%7B%22brand%22%3A%22Not-
A.Brand%22%2C%22version%22%3A%2299.0.0.0%22%7D%5D&d_os=15.0.0&d_ot=Windows&df=true&huah=tr
ue&m_dcl=11699&m_fcps=1246&m_pi=1737&m_pl=12849&m_pv=2&m_rd=15944&m_sh=864&m_sl=0&m_sw
=1536&pl=https%3A%2F%2Fwww.aloyoga.com%2Fsearch%3Fq%3Dthongs&rf=https%3A%2F%2Fwww.aloyoga.c
om%2Fproducts%2Fa0285w-airmesh-venus-thong-black%3Fvariant%3D41346023653556&trackId=f739bbc1-
1ad7-43cc-a382-f6086dd45700&ts=1714607042878&v=3.16.0-2404242003
https
image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
gzip, deflate, br, zstd
en-US,en;q=0.9
_ga_MVLHFV2K4K=GS1.1.1710885639.2.1.1710885647.52.0.0; sc-a-nonce=8ef920f0-76db-4f24-a4f6-
e9f00625c0f9; _ga_111=GS1.1.1711137303.3.1.1711138006.0.0.0;
sc_at=v2JH4sIAAAAAAAAA3GyQ3AMAgEwIqQWA4Zpxy8oQoXn2/mNTS0kSXvVEh4mBS9ZfocnW3K2RehDxYikcv
z/qofWE5KwkAAAAA=

**Figure 13**

81.     Further, when a Website user decides to purchase an item, Snap will know the name of the exact item.  For example, when a user adds an item to their cart, Snap will receive the exact name of the product the user chose to add to their cart.  As seen in Figure 14, when a Website user adds the black, size small, Airmesh Venus Thong to their cart, Microsoft obtains that information



**Figure 14**

E.     **Defendant Enables Heap To Intercept Users' Communications With Defendant.**

82.     Defendant has also integrated Heap's tracking tools, into its Websites, alomoves.com and aloyoga.com.  By integrating Heap's tools into its Websites' code, Defendant has enabled Heap to intercept Defendant's Websites users' communications with Defendant as users search for products on aloyoga.com or answer Defendant's onboarding survey on alomoves.com, without users' consent.

83.    When a user conducts a search on aloyoga.com, communicating with Defendant that they are interested in a particular product, because Defendant installed Heap on its Website, Heap collects the URL for the page on Defendant's Website that the user is on.  The URL includes the search terms the user typed into the search bar on Defendant's Website.

84.    For example, when a user searches for "thongs" on aloyoga.com, Heap intercepts this communication by collecting the URL of the web page which includes the exact search terms. *See* Figures 15-16.



**Figure 15**



**Figure 16**

85.    When a Website user decides to purchase an item, Heap will also know the name of the exact item a user is purchasing.  For example, when a user adds an item to their cart, Heap will receive the exact name of the product the user chose to add to their cart.  As seen in Figure 17,

1    when a Website user adds the black, size small, Airmesh Venus Thong to their cart, Heap obtains

2    that information.



**Figure 17**

86.    Further, Defendant has integrated Heap into alomoves.com.  When a user goes

through the process of signing up for a subscription to Alo Moves, Defendant includes a survey as

part of that process.  The survey asks users a variety of questions, such as what their fitness level is

and how much time they work out.

87.    Each time a user responds to one of these survey questions, Defendant allows Heap

to intercept the answers to the questions.  For example, if a user says they are interested in pilates

and barre classes, Heaps intercepts those communications.  *See* Figures 18-21.



**Figure 18**

**Figure 19**



**Figure 20**

```
id1: 7527292713421690
t1: click
n1: div
c1: Flex-module__flex__2K7w_ SelectBox__SelectBoxBase-sc-yxifhu-0 Select04__SelectBox-sc-ucq8u-0 iOkhmo jdUvD
i1: select-four-barre
y1: @div;#react-body;[data-react-cache-id=SurveyTempEntry-0];[data-react-class=SurveyTempEntry];[data-react-pr
{"user":null,"type":"onboarding"}];|@div;.Box-sc-1fq1wm1-0;.kUKLhH;|@div;.Flex-module__flex__2K7w_;.LayoutCon
r__FlexBody-sc-w3m1m3-4;.jhAYSw;|@div;.Flex-module__flex__2K7w_;.LayoutContainer__FlexWrapper-sc-w3m1m3-3;.e
|@div;.ContentFlex-module__ContentFlex__3Z7xF;.ContentFlex__ContentFlexStyled-sc-1711eyj-0;.Flex-module__flex
7w_;.LayoutContainer__FlexContainer-sc-w3m1m3-2;.dDFRMV;|@div;.Fade__FadeBox-sc-flnalp-0;.Layout__FadeBoxCont
sc-avw870-0;.ZghvB;.fade-enter-done;.iRQca-D;[timeout=350];|@div;.Select04__Container-sc-ucq8u-2;.bekoxX;|@di
ect-four-barre;.Flex-module__flex__2K7w_;.Select04__SelectBox-sc-ucq8u-0;.SelectBox__SelectBoxBase-sc-yxifhu-0;.i0
khmo;.jdUvOr;[color=#000000];|
```

**Figure 21**

88.    The same occurs with every other survey question that Defendant poses, and that its users answer. *See* Figures 22-27.



**Figure 22**



**Figure 23**



**Figure 24**



**Figure 25**

**Figure 26**



**Figure 27**

**F.      Search Terms, Pages Views, Purchases, and Survey Answers that Plaintiff and Class Members Entered on Defendant's Website Are Communications.**

89.     Users' search terms, page views, purchases, and answers to Defendant's survey questions on Defendant's Websites are communications that are a product of users affirmatively entering, and interacting with, information on the Websites (*i.e.*, the confidential communications are not procedurally or automatically generated).

90.     The names of products users search for and view on Defendant's Websites, as well as users' answers to Defendant's survey questions are personal information because they "divulge a user's personal interests, queries, and habits."  *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d at 605 (9th Cir. 2020).

**G.      The Third Parties Intercept User's Communications With Defendant in Real Time**

91.     When a user accesses Defendant's Website, the Third Parties' software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta, Google, Microsoft, Snap, and Heap's servers.  This means that when a Website user communicates with Defendant via the Websites, their communications are collected by the Third Parties in transit or instantaneously as they are delivered *i.e.*, while a particular webpage is loading.

92.     For example, as shown on a web browser's developer tools, Meta begins sending requests for information either while the consumer's browser is setting up a connection with Defendant's Website, aloyoga.com, and/or before the webpage completes loading. Figure 28 shows Meta received a user's search terms inputted in Defendant's search bar 17.33 ***thousandths of a second*** after a user hit enter on their search.



**Figure 28**

93.    In contrast for this same webpage, it took the Website user's browser 0.30 *thousandths of a second* to establish a connection with the Website [67] and 147.65 *thousandths of a second* to finish downloading results once the user searched for "sexy thong" on Defendant's Website.  *See* Figure 29.



**Figure 29**

---

[67] GOOGLE CHROME DEVELOPERS, TIMING BREAKDOWN PHASES EXPLAINED, https://developer.chrome.com/docs/devtools/network/reference/?utm_source=devtools#timing-explanation.

94.    This shows that third-party software script, such as Meta, Google, Microsoft, Snap, and Heap's software script, can intercept the contents of a Website user's communications with Alo while the communications are in transit to Alo or instantaneously as they are delivered.

95.    Further, settled precedent has established that duplicating and redirecting communications in real time are sufficient to state a wiretapping claim.  *See In re Meta Pixel Healthcare Litigation*, 956 F.3d 589, 608, 795 (9th Cir. 2020); *Tanner v. Acushnet Co.*, 2023 WL 8152104, at *5 (C.D. Cal. November 20, 2023).

## III.    DEFENDANT NEVER RECEIVED USERS' CONSENT TO EMPLOY THE THIRD PARTIES' TRACKING TOOLS TO INTERCEPT USERS' COMMUNICATIONS

96.    Defendant allows the Third Parties to intercept users' confidential communications with Alo without obtaining users' consent.

97.    At no point during a person's use of either website does Defendant inform users that Defendant enables third parties to intercept users' communications with Defendant.

98.    When a user searches for products on aloyoga.com and makes a purchase, Defendant does not provide users with any type of notice about its practice of allowing third parties to intercept user communications with Defendant.

99.    When a user answers Defendant's onboarding survey on alomoves.com, Defendant also does not provide a notice as to its practices.

100.    Defendant might argue it put Website users on notice of their practice of enabling the Third Parties to intercept communications based on its cookie banner at the bottom of the Alo Moves website's landing page.  *See* Figure 30.



**Figure 30**

101.    However, as an initial matter, users are neither on notice of, nor do they consent to Defendant's "cookie banner."  The banner is located at the bottom of the screen, and users are in no way required to engage with the cookie banner in order to use the Website.  Effectively, the "cookie banner" is non-binding browsewrap.  *Price v. Carnival Corp.*, 2024 WL 221437, at *4-5 (S.D. Cal. Jan. 19, 2024) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014)).

102.    Defendant might further argue that it put users on notice of its practices by including a notice to its Privacy Policy when users sign up for a subscription.  *See* Figure 31.



**Figure 31**

103.    However, Defendant's attempt to put users on notice here fails.  This notice does not appear until after users complete the onboarding survey.  Therefore, users could not have been given adequate notice of the Privacy Policy at the time they decided to answer Defendant's onboarding survey.

104.    Moreover, even if a user does ever notice the privacy policy, the policy itself misleads consumers into believing the information it collects is primarily for payment processing and customer communications, when that is far from the case.  In the section of the policy entitled "INFORMATION WE COLLECT," Alo broadly says "we collect information that you provide directly to us."[68]   "The types of information you may provide directly to us include, but are not limited to your name, shipping address, billing address, zip or postal code, telephone number, email address, birth date, credit card or payment information, product and communication preferences, family members, demographic information, or any other information that could be

---

[68] ALO, PRIVACY POLICY, https://www.aloyoga.com/pages/privacy-policy.

used to contact you."[69]   However, the collection of user searches fitness survey answers, purchases and page views is much more sensitive.

105.    Worse yet, the section of the Privacy Policy entitled "HOW WE SHARE YOUR INFORMATION" never discloses Alo shares personal information for advertising or analytics either.[70]

106.    Thus, Defendant never properly obtains consent from its users to disclose their communications from either of its Websites.

## CLASS ACTION ALLEGATIONS

107.    Plaintiff Christine Garcia seeks to represent a class of all California residents who entered information into Defendant's Websites, alomoves.com or aloyoga.com, by conducting searches using the search bar on aloyoga.com, or answered Defendant's onboarding survey on alomoves.com while in California (the "Class").

108.    Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

109.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

110.    Excluded from the Class are Alo; any affiliate, parent, or subsidiary of Alo; any entity in which Alo has a controlling interest; any officer director, or employee of Alo; any successor or assign of Alo; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

111.    **Numerosity.**  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are hundreds of thousands of individuals in

---

[69] *Id.*

[70] *Id.*

the Class. Class Members can be readily identified from Alo's records and non-party records, such as those of Meta, Google, Microsoft, and Heap.

112. **Typicality.** Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other members, visited Alo's Website and had her confidential electronic communications intercepted and disclosed to one of the Third Parties.

113. **Adequacy.** Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Class.

114. **Common Questions of Law and Fact Predominate.** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Class include, but are not limited to, the following: whether Defendant violated CIPA § 631 and whether Plaintiff and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

115. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

1

## CLAIMS FOR RELIEF

2

### COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631

3

4      116.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth

5    herein.

6      117.    Plaintiff brings this claim against Defendant individually and on behalf of the Class.

7      118.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of

8    conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability

9    under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine,

10   instrument, contrivance, or in any other manner," does any of the following:

11
12              Intentionally taps, or makes any unauthorized connection,
                whether physically, electrically, acoustically, inductively or
                otherwise, with any telegraph or telephone wire, line, cable, or
13              instrument, including the wire, line, cable, or instrument of any
                internal telephonic communication system,

14              *Or*

15
16              Willfully and without the consent of all parties to the
                communication, or in any unauthorized manner, reads or
                attempts to read or learn the contents or meaning of any message,
17              report, or communication while the same is in transit or passing
                over any wire, line or cable or is being sent from or received at
18              any place within this state,

19              *Or*

20              Uses, or attempts to use, in any manner, or for any purpose, or to
                communicate in any way, any information so obtained,

21              *Or*

22              Aids, agrees with, employs, or conspires with any person or
                persons to unlawfully do, or permit, or cause to be done any of
23              the acts or things mentioned above in this section.

24      119.   CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies"

25   such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21

26   (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to

27   effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    40

1    WL 1744107, at \*1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section

2    631(a) applies to Internet communications.").

3        120.    The Third Parties' Tracking Tools are a "machine, instrument, contrivance, or …

4    other manner" used to engage in the prohibited conduct at issue here.

5        121.    The Third Parties, Meta, Google, Microsoft, Snap, and Heap are "separate legal

6    entit[ies] that offer[] [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike,*

7    *Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, the Third Parties had the capability to

8    use the wiretapped information for their own purposes.  Accordingly, Meta, Google, Microsoft,

9    Snap, and Heap were third parties to any communication between Plaintiff and Class Members, on

10    the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F.

11    Supp. 3d 891, 900 (N.D. Cal. 2023).

12        122.    At all relevant times, the Third Parties willfully and without the consent of all

13    parties to the communication, or in any unauthorized manner, read, attempted to read, and/or

14    learned the contents or meaning of electronic communications of Plaintiff and Class Members, on

15    the one hand, and Defendant, on the other, while the electronic communications were in transit or

16    were being sent from or received at any place within California.

17        123.    At all relevant times, the Third Parties used or attempted to use the communications

18    intercepted by their Tracking Tools to promote and improve their advertising platforms.

19        124.    At all relevant times, Defendant aided, agreed with, employed, permitted, or

20    otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the Tracking

21    Tools and to accomplish the wrongful conduct at issue here.

22        125.    Plaintiff and Class Members did not provide their prior consent to the Third Parties'

23    intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's

24    and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide

25    their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise

26    enabling the Third Parties' conduct.

27

28

126.    The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Alo Websites and where the Third Parties—as enabled by Defendant—routed Plaintiff and Class Members' electronic communications to their servers.

127.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**

128.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

129.    Plaintiff brings this claim against Defendant individually and on behalf of the Class.

130.    CIPA § 632(a) prohibits entities from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

131.    The Third Parties' Tracking Tools are "electronic amplifying or recording device[s]."

132.    At all relevant times, the communications between Plaintiff and Class Members on one hand, and Alo on the other, were confidential.

133.    At all relevant times, Meta, Google, Microsoft, Snap, and Heap intentionally used the Tracking Tools to eavesdrop upon and record such confidential communications.

134.    When communicating with Alo, Plaintiff and Class Members had an objectively reasonable expectation of privacy.  Plaintiff and Class Members did not reasonably expect anyone other than Alo to be a party to the communications, and did not expect that other, third-party entities, Meta, Google, Microsoft, Snap, and Heap, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record their confidential communications.

135.    Plaintiff and Class Members did not consent to any of the Third Parties' actions. Nor have Plaintiff and Class Members consented to the Third Parties' intentional use of an electronic amplifying or record device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

136.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)    For an order certifying the putative Class, naming Plaintiff as the representative of the putative Class, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class Members;

(b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the putative Class on all counts asserted herein;

(d)    For statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiff and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of themselves and the proposed Class, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: June 28, 2024                    Respectfully submitted,

                                        **BURSOR & FISHER, P.A.**

                                        By:    /s/ Stefan Bogdanovich
                                                  Stefan Bogdanovich

                                        L. Timothy Fisher (State Bar No. 191626)
                                        Stefan Bogdanovich (State Bar No. 324525)
                                        Ines Diaz Villafana (State Bar No. 354099)
                                        1990 North California Blvd., Suite 940
                                        Walnut Creek, CA 94596
                                        Telephone: (925) 300-4455
                                        Facsimile:  (925) 407-2700
                                        E-mail: ltfisher@bursor.com
                                                  sbogdanovich@bursor.com
                                                  idiaz@bursor.com

                                        *Attorneys for Plaintiff*